# UNITED STATES DISTRICT COURT

for the

Western District of Washington

Seattle Division

| | | |
|---|---|---|
| Michelle M. O'Callaghan<br><br>*Plaintiff(s)*<br>*(Write the full name of each plaintiff who is filing this complaint. If the names of all the plaintiffs cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names.)*<br>**-v-**<br><br>Ramussen Marine LLC<br><br>*Defendant(s)*<br>*(Write the full name of each defendant who is being sued. If the names of all the defendants cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names.)* | ) | Case No. 2:26-cv-03572-RAJ<br>*(to be filled in by the Clerk's Office)*<br><br>Jury Trial: *(check one)* ☑ Yes ☐ No |

## COMPLAINT FOR EMPLOYMENT DISCRIMINATION

### I. The Parties to This Complaint

#### A. The Plaintiff(s)

Provide the information below for each plaintiff named in the complaint. Attach additional pages if needed.

| | |
|---|---|
| Name | Michelle M. O'Callaghan |
| Street Address | 7945 9th Ave SW Unit B |
| City and County | Seattle, King County |
| State and Zip Code | Washington, 98106 |
| Telephone Number | 2065815840 |
| E-mail Address | mm.ocallaghan@gmail.com |

#### B. The Defendant(s)

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation. For an individual defendant, include the person's job or title *(if known)*. Attach additional pages if needed.

Defendant No. 1

| | |
|---|---|
| Name | Rasmussen Marine LLC |
| Job or Title *(if known)* | |
| Street Address | 415 S Cloverdale Street |
| City and County | Seattle, King County |
| State and Zip Code | Washington, 98108 |
| Telephone Number | (206) 762-3700 |
| E-mail Address *(if known)* | info@marineequipmentsolutions.com |

Defendant No. 2

| | |
|---|---|
| Name | |
| Job or Title *(if known)* | |
| Street Address | |
| City and County | |
| State and Zip Code | |
| Telephone Number | |
| E-mail Address *(if known)* | |

Defendant No. 3

| | |
|---|---|
| Name | |
| Job or Title *(if known)* | |
| Street Address | |
| City and County | |
| State and Zip Code | |
| Telephone Number | |
| E-mail Address *(if known)* | |

Defendant No. 4

| | |
|---|---|
| Name | |
| Job or Title *(if known)* | |
| Street Address | |
| City and County | |
| State and Zip Code | |
| Telephone Number | |
| E-mail Address *(if known)* | |

### C. Place of Employment

The address at which I sought employment or was employed by the defendant(s) is

| | |
|---|---|
| Name | Rasmussen Marine LLC |
| Street Address | 415 S Cloverdale Street |
| City and County | Seattle, King County |
| State and Zip Code | Washington, 98108 |
| Telephone Number | (206) 762-3700 |

## II. Basis for Jurisdiction

This action is brought for discrimination in employment pursuant to *(check all that apply)*:

☑ Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e to 2000e-17 (race, color, gender, religion, national origin).

*(Note: In order to bring suit in federal district court under Title VII, you must first obtain a Notice of Right to Sue letter from the Equal Employment Opportunity Commission.)*

☐ Age Discrimination in Employment Act of 1967, as codified, 29 U.S.C. §§ 621 to 634.

*(Note: In order to bring suit in federal district court under the Age Discrimination in Employment Act, you must first file a charge with the Equal Employment Opportunity Commission.)*

☐ Americans with Disabilities Act of 1990, as codified, 42 U.S.C. §§ 12112 to 12117.

*(Note: In order to bring suit in federal district court under the Americans with Disabilities Act, you must first obtain a Notice of Right to Sue letter from the Equal Employment Opportunity Commission.)*

☐ Other federal law *(specify the federal law)*:

☑ Relevant state law *(specify, if known)*:

RCW 49.60; RCW 49.44 (49.44.085; 49.44.211); RCW 49.76 (49.76.100; 49.76.115; 49.76.120

☐ Relevant city or county law *(specify, if known)*:

## III. Statement of Claim

Write a short and plain statement of the claim. Do not make legal arguments. State as briefly as possible the facts showing that each plaintiff is entitled to the damages or other relief sought. State how each defendant was involved and what each defendant did that caused the plaintiff harm or violated the plaintiff's rights, including the dates and places of that involvement or conduct. If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph. Attach additional pages if needed.

A. The discriminatory conduct of which I complain in this action includes *(check all that apply)*:

- ☐ Failure to hire me.
- ☑ Termination of my employment.
- ☐ Failure to promote me.
- ☐ Failure to accommodate my disability.
- ☑ Unequal terms and conditions of my employment.
- ☑ Retaliation.
- ☑ Other acts *(specify)*: Failure to accommodate my schedule when notified of stalking

*(Note: Only those grounds raised in the charge filed with the Equal Employment Opportunity Commission can be considered by the federal district court under the federal employment discrimination statutes.)*

B. It is my best recollection that the alleged discriminatory acts occurred on date(s)

4/5/2024, 5/1/2024, 7/24/2024, 9/30/2024, 12/2/2024, 12/5/2024; 12/11/2024, 3/21/2025, 9/18/2025

C. I believe that defendant(s) *(check one)*:

- ☐ is/are still committing these acts against me.
- ☑ is/are not still committing these acts against me.

D. Defendant(s) discriminated against me based on my *(check all that apply and explain)*:

- ☑ race my Hispanic heritage
- ☐ color
- ☑ gender/sex my gender (female)
- ☐ religion
- ☐ national origin
- ☐ age *(year of birth)* ________ *(only when asserting a claim of age discrimination.)*
- ☐ disability or perceived disability *(specify disability)*

E. The facts of my case are as follows. Attach additional pages if needed.

Please see attached written statement.

*(Note: As additional support for the facts of your claim, you may attach to this complaint a copy of your charge filed with the Equal Employment Opportunity Commission, or the charge filed with the relevant state or city human rights division.)*

## IV. Exhaustion of Federal Administrative Remedies

A. It is my best recollection that I filed a charge with the Equal Employment Opportunity Commission or my Equal Employment Opportunity counselor regarding the defendant's alleged discriminatory conduct on *(date)*
6/23/2026

B. The Equal Employment Opportunity Commission *(check one)*:

☐ has not issued a Notice of Right to Sue letter.

☑ issued a Notice of Right to Sue letter, which I received on *(date)* 06/25/2026 .

*(Note: Attach a copy of the Notice of Right to Sue letter from the Equal Employment Opportunity Commission to this complaint.)*

C. Only litigants alleging age discrimination must answer this question.

Since filing my charge of age discrimination with the Equal Employment Opportunity Commission regarding the defendant's alleged discriminatory conduct *(check one)*:

☐ 60 days or more have elapsed.

☐ less than 60 days have elapsed.

## V. Relief

State briefly and precisely what damages or other relief the plaintiff asks the court to order. Do not make legal arguments. Include any basis for claiming that the wrongs alleged are continuing at the present time. Include the amounts of any actual damages claimed for the acts alleged and the basis for these amounts. Include any punitive or exemplary damages claimed, the amounts, and the reasons you claim you are entitled to actual or punitive money damages.

I humbly ask the court for the following relief;
(1) $125,387 for Back-pay for wages and bonuses, a figure that represents $158,267 in hourly wages and monthly bonuses I would have earned up to the time of this filing, less $32,880 ($22,880 for unemployment compensation received in 2025 and $10,000 for portion of severance settlement that is for lost wages).
(2) $15,750 for legal fees to lawyer who assisted with demand letter (Exhibit 27).
The total of these losses is $141,137.

## VI. Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A. For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing: 09/16/2026

Signature of Plaintiff [signature]

Printed Name of Plaintiff Michelle O'Callaghan

### B. For Attorneys

Date of signing:

Signature of Attorney

Printed Name of Attorney

Bar Number

Name of Law Firm

Street Address

State and Zip Code

Telephone Number

E-mail Address

**E. The facts of my case are as follows.**

I was hired at Rasmussen Marine LLC (formerly Rasmussen Equipment Company) on October 7, 2000. My final day of employment was December 11, 2024. For the final ten years of my employment with Rasmussen Marine LLC I worked as a Sales' Coordinator. For the first fourteen years, I worked as an Administrative Assistant. I was the only woman in the Sales' Department. I did a very good job and was consistently one of their top performers. I was always employed full-time. The location where I worked had thirty-five employees and only three, including myself, were women.

Rasmussen Marine LLC is a company registered in Washington State. It is located at 415 S Cloverdale Street, Seattle, Washington 98108, in King County. The facility is the length of a city block. Consequently, the office which is located at the far end of the facility has a different address, 450 S Trenton Street. The events pertaining to my closing of the facility occurred at 450 S Trenton Street.

Rasmussen Marine LLC is one of five independent companies that belong to Marine Equipment Solutions. Some of the exhibits that are referenced in this statement will refer to Marine Equipment Solutions, such as my letter of resignation. I am only bringing suit against Rasmussen Marine LLC.

On April 4, 2024, a frightening incident happened while I was closing the facility by myself. This involved a man who was a stranger stopping his car and trying to intimidate me. He wanted me to get into his car and when I said "No!", he became angry. My ride arrived and I was able to get away from him. I told the Branch Manager, Erik Backstrom, about the incident the next day.

I asked him to change my shift so I was not closing by myself. The facility was open Monday-Friday, from 7:00 AM-4:30 PM. All but five employees worked an earlier shift, either from 7:00 AM-3:30 PM, or 7:00 AM-4:00 PM, depending on whether or not they took a half-hour lunch, or an hour long lunch. Only five employees worked from 7:30 AM-4:30 PM. I was the only woman that worked the closing shift. I was also one of only two people in my department that worked this shift.

I did not have a vehicle, so I relied on Uber rides. I could not arrange a ride until I had closed the facility and activated the alarm system. This required me to leave the secured part of the facility. I waited for my rides next to a locking gate. Erik Backstrom refused my request. He told me that he couldn't accommodate me simply because I was a woman.

This is not the first time I had reported a security incident to Erik Backstrom. From October 2021, I had reported five incidents before this one in April 2024. One of the incidents involved a coworker. When this incident happened, in June 2022, we were both unable to leave the facility because of a man who was walking up and down the street with a stick screaming obscenities and shaking the stick at us. After each incident, I tried to get help. I asked for my shift to be moved because the incidents always happened during closing time. Each time Erik Backstrom refused.

He made sexist and racist remarks when I asked for help. When I told him about the incident involving a coworker, he thought it was very funny. He was so amused because my coworker, Nick Freyberg, was shorter than I am. Erik Backstrom said, "the one time someone was here to help you, it was the only man in the office that is even shorter than you." He also said that Nick Freyberg looked a bit taller

"because of his fro", a reference to Nick Freyberg's hair which Erik believed was an African American feature. Nick Freyberg was of mixed ancestry. Erik was very sarcastic while describing Nick's hair.

Erik Backstrom later claimed that he had instructed my male coworkers to wait and make certain that my ride arrived before leaving. When I reached out to Nick Freyberg for a statement, in February 2025, while preparing for a hearing with the Office of Administrative Hearings, he told me that he was not aware of Erik Backstrom ever having asked any of my male coworkers to wait with me. Nick Freyberg provided a statement regarding this and the incident from June 2022 (Exhibit 1).

On April 30, 2024, the man that had harassed me on April 4th returned. This time, when I was closing by myself, he stopped his car and once again tried to intimidate me and order me to get into his car. He started getting out of his car when my ride arrived. I was terrified. I was able to get away from him. The following day, I told Erik Backstrom what had happened. I asked again for my shift to be changed so I wasn't waiting for a ride by myself. He refused.

He told me that the company had already accommodated me by simply employing me. He said that I was limited in what I could do because I am a woman. He pointed out that when salesmen traveled to trade shows, I could not accompany them because I could not share a hotel room with any of them. He also implied that men were better suited for the construction industry. He told me that he was not going to change my shift simply because I was a woman.

He also threatened me and told me that if I went over his head, there would be consequences and those consequences could be terrible because the job market was not great at that time. He assured me that no one else was going to pay me what they paid me implying that I was overpaid. He said that I should be grateful especially with my limitations. He told me that I was a liability because I was a woman.

The man who harassed me twice in April 2024 returned on July 23, 2024. This time, while I was waiting for a ride, I was not the last person to leave. I was able to get behind a locked gate because the alarm had not yet been activated. I waited for my ride. The man backed up his car. I thought he had driven away. When I left the secured area to wave down my ride, the man sped up from behind me and drove past me far too fast and far too close. He nearly hit me. My Uber driver had to quickly maneuver so that he wasn't hit. I was quite shaken by this incident.

I spoke with Erik Backstrom the next day and told him what had happened. I asked again for my shift to be changed. He told me that the neighborhood was terrible because it "looked like East LA", a comment he had made before in front of me and a coworker, Brandon Miller (Exhibit 2). Then he told me that I looked like East Los Angeles too, so I shouldn't have any trouble handling the "thugs in the neighborhood" because they were "my people". He then walked out of his office singing a song for the rest of the sales' crew about "working the night shift".

On September 27, 2024, the man returned. On that Friday, I was closing with a coworker, Hayden Monasmith. The man that was stalking me usually drove a small, black car. On that day, he drove a white box-truck. He parked it right outside the locking gate about forty-five minutes before our closing time. Hayden and I locked up the facility together. Hayden commented on how long the man had been parked there.

That street, South Trenton Street, is very narrow. It has neither sidewalks nor shoulders. It is similar to an alleyway (Exhibit 3). Sometimes delivery trucks would park alongside our building because there isn't a shoulder on that street where a larger vehicle could park. I assumed that the driver of the truck was waiting for one of our residential neighbors to return home to deliver something. I hadn't looked closely at the driver to see that it was the same man that had been harassing me.

As soon as Hayden Monasmith and I finished locking up the facility, Hayden got into his car and drove away. I proceeded to wait for my Uber ride. Once Hayden drove away, the man called to me from his truck. He claimed he had an order to pickup and that I needed to open the gate for him. I told him that we were closed. I took a few steps towards his truck and shouted again that we were closed. Then he quickly moved his truck forward and trapped me between the locked gate and his truck.

He shouted at me and ordered me to open the gate. When I refused, he berated me screaming that I needed to open the gate. He repeatedly said that he knew that I was alone. He then drove forward blocking my escape through a locking side gate (Exhibit 4).

This locking side gate was where I waited for my rides. It was connected to the larger gate that was pulled across to the locking side gate to secure the facility (Exhibit 5). I had moved away from the locking gate when the man had called to me. When he pulled his truck forward, I wasn't able to return to the locking side gate because he had blocked my way. He got out of his truck and again tried to convince me to open the gate. My ride arrived and I was able to get away from him by running around to the other side of his truck.

The following Monday, while I was telling Hayden Monasmith about what had happened, Erik Backstrom interrupted us and told me not to discuss it further. I followed him as he walked away from us and told him that he needed to change my shift before this man hurt me. He refused to help me. He laughed at me. He then started discussing his opinion of the neighborhood with others in the office. He commented on how much crime occurred in the neighborhood with a big grin. He repeatedly said it was a dangerous neighborhood while looking in my direction and laughing.

At the end of the day, I tried speaking with Erik Backstrom again. He told me in a sarcastic voice that everyone needed to be treated equally and that if I could not handle closing because I am a woman, he would find someone else. He told me again that there would be consequences if I went over his head. I reminded Erik Backstrom that some of my male coworkers that had worked the same shift had been able to move to the earlier shift without even asking. I told him that he was treating me differently. I was the only person who had reported security concerns and safety incidents and yet he still refused to help me. He shouted at me to "get the hell out of his office."

Two months later, on November 27, 2024, the man returned after I had closed the facility. It was the day before Thanksgiving. I had closed with a coworker, Nathan Goode. I was waiting outside the locked gate by myself. Nathan had gone to retrieve his car from an employee parking lot that was about forty feet away (Exhibit 6). The man stopped his car near me and started to get out. Nathan Goode suddenly pulled out of the employee parking lot. Once he did, the man got into his car and drove away.

We were closed for the next four days for the Thanksgiving weekend. On Monday, December 2, 2024, I tried to talk with Erik Backstrom again. While telling him about what had happened, he got very angry and told me that he wasn't going to keep reminding me that he would not change my shift. If I could not handle closing by myself, then that was my problem. He told me that he would not accommodate me because I was a woman. "That too was my problem". He thought that final remark was very funny.

The facility is secured with gates and an alarm system. The last person to leave the office must secure the gate, activate the alarm and leave the secured part of the facility. This involved activating an alarm on one side of the building and then running around to the other side of the building and entering a code into another alarm keypad before finally leaving the secured part of the facility and locking the gate. The alarm system was connected to several sensors that were located on interior doors and windows. If just one of those doors or windows was not firmly shut, the alarm did not activate. When this happened, the alarm keypads did not indicate which one of the sensors was preventing the alarm system from activating, which meant that each door and window had to be checked. This process could take more than ten minutes.

Consequently, when I closed by myself, I had to make certain the alarm system was activated before I could call for a ride. I couldn't wait behind the locked gate. Management was aware of this. On a few occasions, when one of the managers was closing, I would be forced to leave the secure part of the facility so they could finish locking up. Despite this, the company later claimed that I did have the option of waiting in a secure area while closing by myself. They blamed me for the stalking incidents.

After my discussion with Erik Backstrom on December 2, 2024, I decided to go over his head to the company president, Dan Ellis. I spoke with him on Thursday, December 5, 2024. I walked into his office and told him what had been happening with Erik Backstrom. I told him about the stalking incidents and that I was determined to file a police report, but that I needed him to assure me that I would not face retaliations from Erik Backstrom. I told him about the verbal abuse, harassment, discrimination and insults I had suffered because of Erik Backstrom. Dan agreed that I should file a police report. He told me to return to my desk. He said that he would meet with me again later that day.

Two hours later, I was called into a private meeting with Dan Ellis and the company Controller, Cord McCormick. I was asked to tell my story again. I told them that I had reported security incidents to Erik Backstrom for months and that he had refused to help me. Instead he had insulted, mocked and threatened me. I told them about incidents when Erik Backstrom had made racial and sexist comments. I discussed the five stalking incidents that had occurred while I was closing the office by myself and the fact that all five incidents had occurred outside of a locking gate next to the customer parking spots. I went into detail and described each incident. I told them that I had suffered discrimination because of Erik Backstrom and his actions had led directly to the stalking incidents.

I asked them to adjust my shift so that I was not closing by myself and to guarantee that I would not face retaliations from Erik Backstrom for reporting the discrimination I had endured. It would have been very easy for them to adjust my shift because almost all of the sales' people worked the earlier

shift. Moving me to an earlier shift would not have created any kind of conflict. I also asked to take a couple of hours of paid or unpaid leave to file a police report.

Cord McCormick told me that they had spoken with Erik Backstrom about my accusations. They believed that there had been "some sort of misunderstanding." They encouraged me to go to the police and to warn my coworkers about the man who had been stalking me. They also refused to help me. They insisted that the incidents happened off company property so they could not do anything to help me. They refused to adjust my shift or allow me to take any time to file a police report.

When I told them that I could not be safe if they would not help me, they instructed me to provide my letter of resignation. They later claimed that they did adjust my shift. I have copies of my timecards signed by the Human Resources Director which show that my shift was never adjusted. I continued to work until 4:30 PM, except for my last day when they forced me to leave before 11:00 AM (Exhibit 7).

I returned to my desk and wrote a letter of resignation. In my letter, I referred to the meeting I had that day with the company controller and company president. I sent my letter of resignation to the company controller, that same day, at 3:44 PM (Exhibit 8). At 4:11 PM, the company president, Dan Ellis, emailed me to inform me that Hayden Monasmith was available to escort me to my Uber ride at the end of my shift, until the end of the following week (Exhibit 9). I had given notice to work until the end of the following week, Friday, 12/13/2024. I didn't want to give notice but I felt compelled to.

It was clear from Dan Ellis's email that my escort was not permanent. It was temporary and only offered to me after I emailed my letter of resignation. I accepted the offer of an escort and was escorted to my rides for the remainder of the time I was working at Rasmussen Marine LLC. The escort was always Hayden Monasmith.

At 4:56 PM, on that same day, the controller forwarded my email with my attached letter of resignation to the company HR Director, Amy Tumbleson. He copied the company president, Dan Ellis and added a note. He stated in his note that I had "decided to resign" after meeting with him and the company president. He commented on my security issues and a "specific person who she feels has been lurking…". He went on to state that he and the company president would "write up our conversation….so we're all on the same page" (Exhibit 10). They put a copy of this internal email into my HR file. When I later asked for a copy of my HR file, I received a copy of this correspondence. This email also contains the time stamp (3:44 PM) of my email to Cord McCormick, when I sent my letter of resignation.

On that day, 12/5/2024, I was instructed to give them my letter of resignation and Cord McCormick received it at 3:44 PM. It took only twenty-seven minutes for Dan Ellis to email me the conditional and temporary offer of an escort. Forty-five minutes later, Cord McCormick was emailing Dan Ellis and Amy Tumbleson and stating that they had to make sure they were "all on the same page." Cord McCormick's internal email does not contain any comments that would indicate that they were concerned about my personal safety or the fact that I had endured racial and gender discrimination.

Months later, in March 2025, when I asked for a copy of my HR file, a separate statement by Cord McCormick was included that is dated 12/6/2024. It is not an email and does not contain any type of

time stamp other than what he personally typed. In it, he claimed that I tendered my resignation earlier and then discussed matters with him and Dan Ellis. Anyone reading it could easily assume, from the wording, that he is referring to events that happened that day, 12/6/2024, instead of 12/5/2024.

He claimed that I discussed “a couple incidents off property”. He falsely claimed I could have waited behind a closed and locked gate. He claimed that he told me that they asked my male counterparts to walk me to my ride. This is completely and utterly false. He claimed they offered to adjust my shift but I refused because I “simply wanted a change.” At the end of this statement, he admitted that they asked me to write a letter of resignation even though I had supposedly “tendered my resignation” earlier (Exhibit 11). The date of Cord McCormick’s statement cannot be verified by anyone but him.

On Sunday, December 8, 2024, I filed a police report (Exhibit 12). I had to wait until the weekend to file my police report because they refused to give me any time off. Three days later, on December 11th, I was called into Cord McCormick’s office. The only other person who was present was the Assistant Branch Manager, Mike Arnold. Cord McCormick told me that they wanted to find a way for me to stay. Then he handed me a letter written by Dan Ellis (Exhibit 13). Dan Ellis was out of the office that day. He had written the letter and emailed it to Cord McCormick, but he did not email it to me.

Cord McCormick asked me to read this letter and sign it. In this letter, Dan Ellis made several false claims. He stated once that I had met with him and Cord McCormick on Friday, December 6, 2024 instead of the day before, on Thursday, December 5th. Twice, he claimed that my shift had been adjusted. He claimed six times that the incidents had happened outside of the company property. He claimed that they had offered to have someone walk with me on a nightly basis, without mentioning that their offer of an escort was temporary and only made after they instructed me to give my letter of resignation.

He even claimed that he had installed lighting to make me safe. The lighting had been installed to assist forklift operators. It was installed months before the first stalking incident. He claimed that I could wait inside the building or behind a locked gate. I did not have these options if closing by myself. He also stated in his letter that I did not deserve unemployment compensation or any kind of severance pay.

After reading the letter, I told Cord McCormick that I had to discuss some of the details with Dan Ellis before I could sign. Cord McCormick snatched the letter away from me. He accused me of lying about Erik Backstrom. Then he ordered me to leave. Within fifteen minutes, I was in an Uber car leaving the facility for the last time.

That same day, Cord McCormick emailed Amy Tumbleson. The copy of this email in my HR file states that he emailed her at “7:01 PM” and then Dan Ellis comments on the same email, on that same day, at 4:15 PM. The email time stamp for Cord McCormick’s original email to Amy Tumbleson has been altered by them (Exhibit 14).

In this email to Amy Tumbleson, he writes that his meeting with me was “not very productive” and that I was “belligerent” and that I “would not sign”. He writes that my main objection to this letter they tried to force me to sign is that Dan Ellis states that I was not eligible for unemployment benefits or any kind of severance pay because my resignation was “voluntary”. He comments on how they needed to

pay me through the end of the week. Dan Ellis's comment on the same email is that someone named "Lindsey" would put them in touch with a lawyer.

On December 16, 2024 I filed for unemployment. I provided a copy of my police report when I filed my claim. In my initial claim, I described the stalking incidents in great detail. I listed "stalking" as the primary reason for leaving my job. Six weeks later, I was denied. I immediately appealed and my case was sent to the Office of Administrative Hearings (OAH). When this happened, I received copies of everything Rasmussen Marine LLC had provided to the Employment Security Department. The HR Director, Amy Tumbleson, forwarded copies of Dan Ellis's letter, a statement by Erik Backstrom claiming that he had heard me laughing about the stalking incidents and a copy of my letter of resignation (Exhibit 15).

The HR Director was the only person corresponding with the Washington State Employment Security Department. She lived and worked in Berne, Indiana. She had never even set foot in the Seattle facility. She worked closely with Dan Ellis and Cord McCormick to gather information. She provided several false statements to the Employment Security Department. She blamed me for the stalking incidents and claimed that I could have waited for a ride someplace safer and that I opted to be less safe.

She also claimed that my shift had been adjusted when I asked for this. She claimed that I provided my letter of resignation and then informed Dan Ellis and Cord McCormick about the stalking incidents. She also insisted that the incidents happened off company property.

Rasmussen Marine LLC made contradictory statements by falsely claiming that my shift was adjusted and then admitting that it wasn't. They eventually claimed that they couldn't adjust my shift because my attendance was too terrible. I managed the largest account for the company. The customer's name was Ballard Marine Construction. If I was such a terrible, unreliable employee, I doubt I would have been allowed to manage their most important and lucrative account.

Furthermore, if my attendance was so terrible, they could have terminated my employment. Instead they insisted on compromising my security. Most of the employees at that location worked the opening shift, so even if they had reason to doubt my ability to arrive on time, they would not have been depending on me alone to open the facility.

I never received reprimands for my attendance. My employee HR file does not contain a single reprimand of any kind. I was threatened when I reported the stalking incidents and the end result was that I was forced to choose between my personal safety and my job security.

In preparation for my hearing, I emailed several coworkers asking for witness statements. I was planning on using their witness statements for my OAH hearing. I also wanted to use some of these statements for the discrimination complaint I was planning on filing with the EEOC because some of my former coworkers that I reached out to had witnessed the discrimination that I suffered. I sent emails to a dozen different people. I did not receive any responses.

On my last day, when I was ordered to leave, a coworker, Nathan Goode, on learning of what had happened, had jumped up and ran out to the exterior shops to inform everyone. Suddenly more than a

dozen people were filing into the office to say goodbye to me. Some were crying. I found it hard to believe that none of these same people would respond to my emails.

I called a former coworker, Richard Taylor, on his cell phone and asked him why no one, including him, had responded. He said, "One word, management." Later when I asked for my HR file, I found two of the emails in my file. They had been marked by Cord McCormick as "record 1" and "record 2" (Exhibits 16 and 17). He forwarded the emails to Amy Tumbleson. I never emailed either of them with requests for witness statements. They interfered with my attempts to correspond with my former coworkers about the discrimination, constructive discharge and retaliation I had suffered. Their behavior had a direct impact on my complaint with the EEOC. Their interference was the main reason I did not file my complaint sooner.

At my OAH hearing, Amy Tumbleson represented the company. Besides the aforementioned documents she had forwarded to the Employment Security Department, she also provided a one-page statement by Cord McCormick (Exhibit 18). In his statement, he does not even mention my two formal meetings even though he was present in both of them. Instead he tried to claim that I could have waited in a safe area by providing a picture of the facility with an area marked out that he claimed was the site of the alarm keypad.

The area he marked out is a blank wall. He falsely claimed that an alarm keypad was located much closer to the locking gate and misleadingly describes the process of disarming the alarm, instead of the very different and more complicated process of arming the alarm. He also fails to mention that there were two alarm keypads that had to be activated at opposite sides of the building.

I was able to upload pictures which refuted his claims (Exhibit 19). It is possible that he unintentionally marked the wrong spot for one of the alarm keypads, but it is difficult to believe because one of the alarm keypads is under a large, green canopy. It is next to the main door to the office. He also doesn't mention the second alarm keypad that had to be activated before the one under the canopy could be activated. This other keypad was on the other side of the building. He closed on enough occasions to know perfectly well that when the facility was closed it required entering a code into two different alarm keypads several feet away from each other.

In his statement for my OAH hearing, he also claimed that "it was not a normal occurrence for Michelle to be the last person at the facility". I frequently had to close by myself. Furthermore, he is not qualified to make this statement because he frequently worked from home. When he did come into the office, he typically left an hour or more before closing time.

The street where I waited for a ride, South Trenton street, is extremely narrow and has no shoulders or sidewalks. The property boundary line meets the street. They knew that anyone waiting outside of their locking gate was standing on company property. If I hadn't been, I would have been in the line of traffic (Exhibits 3, 4, and 5). Dan Ellis and Cord McCormick also knew that I did not have the option of waiting in a secure area when closing by myself because they had both closed the facility on multiple occasions.

I closed by myself so often because I was one of only a few employees that did not have a vehicle. The only other people closing the facility had usually driven away before I even had a chance to call for a ride. Management was aware of this and knew that if I was working the closing shift that I would likely be forced to close by myself because anyone else would be able to immediately leave. None of the others working the closing shift relied on public transportation. The only coworkers that did rely on public transportation left an hour before I did.

It was unheard of for a person who relied on public transportation to close the facility. It simply wasn't done in all of the years I worked at that facility until I was moved to the closing shift. I did not have a vehicle because, frankly, I was too frightened to use the employee parking lot. The employee parking lot was fenced in, had no lighting and was isolated (Exhibit 6). It was located behind the main buildings. When the gate to the employee parking lot was open, anyone could enter from the street. It was open until the facility was closed.

Two of my former female coworkers that left long before I did were equally intimidated by that parking lot. They both started very early in the morning before most of the employees arrived. One, Barb Timian, would wait in her locked car for the other one, Sofia Diaz, to arrive so they could quickly walk through the parking lot together towards the safety of the office building. I did not want to be in that parking lot by myself at the end of the day. Consequently, I relied on public transportation so I could wait outside the locking side gate that was part of the main gate to the facility. It was frightening too, but not as frightening as that parking lot.

When Rasmussen Marine LLC was first contacted by the Employment Security Department and asked to give the reason for my leaving, they stated that I "quit" because of "stalking", but later the HR Director spent eleven days corresponding with her contact at the Employment Security Department providing her with false information to convince her that I had caused the stalking incidents. She even claimed that I could have waited safely inside the building and looked out of a window until my ride came. Her correspondence with the Employment Security Department convinced them that I had "quit without good cause."

I had to have two OAH hearings because the judge presiding over my first hearing forgot to have us swear the usual oath before giving testimony. At the first hearing, the HR Director corrected herself and admitted that my shift had never been adjusted. In my second hearing, she did not correct herself and made no effort to correct any of her previous assertions. I could not use any testimony from the first hearing, in the second hearing. The judge at the second hearing still ruled in my favor. I received my first benefit payment on April 5, 2025, fifteen weeks after being forced to leave my job.

On July 17, 2025, I reached out to Washington State's Labor and Industries to file a report against Rasmussen Marine LLC (Exhibit 20). I was told that I could qualify for Crime Benefits of up to $15,000. I was advised to first file a complaint under Washington's Domestic Violence Leave law which covered stalking too. I filed a complaint and an investigator began working with me. Her name was Tiffany Lowry.

On September 17, 2025, she told me that she could not continue investigating my case because my former employer (1) had adjusted my shift, (2) had provided an escort, (3) I could have waited behind a locked gate, (4) they installed lighting for me, and (5) my complaint was past the statute of limitations, even though these incidents happened less than a year before and the statute of limitations was two years (Exhibit 21). None of these claims were true and these same false claims had almost prevented me from collecting unemployment insurance.

The investigator was even convinced that the incidents had happened much earlier, even though I provided evidence to the contrary. She was utterly confused because of the false statements fed to her by Rasmussen Marine LLC. I was forced to withdraw my complaint. I was also forced to abandon any Labor and Industries claims for benefits.

I had to close the facility by myself despite the fact that this required me to wait alone in a dimly lit area outside of a locked and gated facility.  None of my coworkers that relied on public transportation were required to do the same. The other women who worked at this facility were not required to close. None of my male coworkers who worked the closing shift were forced into the same compromising situation. I was the only employee that reported security incidents while closing by myself. Instead of simply adjusting my shift, I was told that I should have no problem with the neighborhood that "looked like East LA." and the"neighborhood thugs" because I looked like I belonged in East LA. and these "neighborhood thugs" were "my people".

The Washington Law Against Discrimination ("WLAD") prohibits discrimination in employment on the basis of sex, age, disability, and other protected characteristics. WASH. REV. CODE § 49.60.030. To accomplish the WLAD's purpose of eliminating and preventing discrimination, the Legislature has directed Washington courts to liberally construe the WLAD's provisions. WASH. REV. CODE §§ 49.60.010, 49.60.020. "'[A] plaintiff bringing a discrimination case in Washington assumes the role of a private attorney general, vindicating a policy of the highest priority.'" Jin Zhu v. N. Cent. Educ. Serv. Dist.-ESD 171, 404 P.3d 504, 508 (Wash. 2017) (quoting Marquis v. City of Spokane, 922 P.2d 43, 49 (Wash. 1996))

Employers are prohibited from discriminating against any person in terms and conditions of employment based on the individual's protected characteristic (RCW 49.60.180). Disparate treatment is a type of unlawful discrimination where an employer treats an individual less favorably because of their protected class, including their gender. Blackburn v. State, 186 Wn.2d 250, 258, 375 P.3d 1076 (2016) (quoting Shannon v. Pay 'N Save Corp., 104 Wn.2d 722, 726, 709 P.2d 799 (1985)).

"An employer who discharges, reassigns, or harasses for a discriminatory reason faces a disparate treatment claim." Pulcino v. Fed. Express Corp., 9 P.3d 787, 793 (Wash. 2000).  Disparate treatment claims require showing that the employer treated the employee differently from similarly situated employees. See Haubry v. Snow, 31 P.3d 1186, 1192 (Wash. Ct. App. 2001).

To prove disparate treatment, an employee must show that they (1) belonged to a protected class; (2) suffered an adverse employment action; (3) were doing satisfactory work; and (4) were treated differently than someone not in the protected class. Kirby v. City of Tacoma, 124 Wn. App. 454, 468, 98 P.3d 827 (2004). Courts take an "expansive view of the type of actions that can be considered

adverse employment actions." Ray v. Henderson, 217 F.3d 1234, 1241 (9th Cir. 2000). "When an employee makes out a claim of disparate treatment under the WLAD…the employer's action is unlawful unless the employer has a valid justification." Blackburn, 186 Wn.2d at 258.

Rasmussen Marine LLC discriminated against me by requiring me (and no other female employees) to close the facility by myself despite working in the same role with the same required skills and responsibilities as my male colleagues who were not forced to compromise their security to keep their employment. I am a woman and a member of a protected class. I was an excellent employee, performing my duties with the same skills and responsibilities as my male counterparts, but I was required to close the facility by myself while most of my male coworkers were not. The only other people who did work the closing shift did not have to rely on public transportation and could leave the facility immediately.

Rasmussen Marine LLC has failed to articulate a non-discriminatory reason for treating me less favorably than my similarly situated male colleagues. Rasmussen Marine LLC is guilty of discriminating against me as a woman. Erik Backstrom's comments about my features and presumed ethnic identity were also blatant acts of racial discrimination.

When I was forced to leave Rasmussen Marine LLC on December 11, 2024, they continued their retaliation of me for many months. The WLAD also prohibits employers from retaliating against persons who oppose discriminatory practices prohibited by the act." Bittner v. Symetra Nat'l Life Ins. Co., 558 P.3d 177, 187 (Wash. Ct. App. 2024). To establish a prima facie case of retaliation for a protected activity under the WLAD, "an employee must show that (1) [she] engaged in statutorily protected activity; (2) an adverse employment action was taken; and (3) there was a causal link between the employee's activity and the employer's adverse action." Estevez v. Fac. Club of Univ. of Wash., 129 Wn. App. 774, 797, 120 P.3d 579 (2005). Also see Cornwell v. Microsoft Corp., 430 P.3d 229, 234 (Wash. 2018).

To demonstrate that I was engaged in a statutorily protected activity, I "need only prove that [my] complaint went to conduct that was at least arguably a violation of the law, not that [my] opposition activity was to behavior that would actually violate the law against discrimination." Id. at 798 (citing Kahn v. Salerno, 90 Wn. App. 110, 130, 951 P.2d 321 (1998). Furthermore, an adverse employment action is one that a "reasonable employee would have found…materially adverse, meaning that it would have 'dissuaded a reasonable worker from making…a charge of discrimination.'" Boyd v. State, Dep't of Soc. & Health Servs., 187 Wn. App. 1, 13, 349 P.3d 864 (2015) (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006)).

Finally, in satisfying the third prong of their retaliation claim, an employee must prove a causal connection by showing that their protected activity was a substantial factor motivating the adverse employment action. Currier v. Northland Servs., Inc.,182 Wn. App. 733, 742, 332 P.3d 1006 (2014). "Retaliation need not be the main reason behind the [adverse action] but instead need only be the reason that "tips the scale" toward termination." Id. at 748. Because employers will rarely reveal that they are motivated by retaliation, plaintiffs ordinarily must resort to circumstantial evidence to

demonstrate retaliatory purpose." Id. at 747. "Proximity in time between the [adverse action] and the protected activity… [is a factor] that suggest[s] retaliatory motivation." Estevez, 129 Wn. App. at 799 (citing Vasquez v. State, Dep't of Soc. & Health Servs., 94 Wn. App. 976, 985 974 P.2d 348 (1999).

I was subjected to a hostile working environment. To prove a hostile work environment claim, the plaintiff must show: (1) that she is a member of a protected class, (2) that the harassment was unwelcome, (3) that it was because of the protected status, (4) that it affected the terms or conditions of employment, and (5) that it was imputable to the employer. Robel v. Roundup Corp., 59 P.3d 611, 616 (Wash. 2002). "To prevail on a hostile-work-environment claim, the plaintiff must show that the workplace was so 'permeated with discriminatory intimidation, ridicule, and insult … that [it] was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Diemert v. City of Seattle, 776 F. Supp. 3d 922, 938 (W.D. Wash. 2025) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993))

I was threatened with termination when I tried to raise my concerns to the company leadership including the President. I was ultimately forced to resign from the company. Each time I tried to raise my concern of being the only woman forced to close and experiencing unsafe acts, my concerns were ignored or dismissed, and, in several cases, I was openly mocked for raising them. The retaliatory treatment culminated when the company president refused to provide me with time off to file a police report and claimed that they could not because the incidents happened off company property. When I told leadership that I could not be safe, they told me to provide a written letter of resignation.

Of note there were no discussions regarding my resignation before that formal meeting which occurred on December 5, 2024, and not December 6, 2024, as the president alleged in his December 11, 2024 letter that the company controller, Cord McCormick, tried to force me to sign.

To establish constructive discharge, I must show: (1) my employer took a deliberate action, which made working conditions so intolerable that a reasonable person would feel compelled to resign; and (2) I did in fact resign because of that intolerable condition. See Glasgow v. Georgia-Pacific, Corp. 103 Wn.2d 401, 408 (1985); see also Sneed v. Barna, 80 Wn. App. 843, 849, review denied, 129 Wash.2d 1023, 919 P.2d 600 (1996). The key inquiry is whether "working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." Sneed, 80 Wn. App. At 849.

Management refused to help me when I reported illegal discrimination and stalking incidents. On the contrary, they told me to submit my letter of resignation. Within a week of reporting these incidents, management tried to force me to sign a letter written by the company president, Dan Ellis, that falsely claimed that they had done some of the things required by the law. When I did not sign, I was forced to leave immediately. Any reasonable person would have refused and asked to discuss the contents.

For a claim of constructive discharge in violation of public policy, I must also demonstrate that (1) my constructive discharge may have been motivated by reasons that contravene a clear mandate of public policy, and (2) the public-policy-linked conduct was a significant factor in the decision to discharge me.

See Martin v. Gonzaga Univ., Wn.2d , 425 P.3d 837, 844 (2018). The first element encompasses clarity and jeopardy components (citing Becker, 184 Wn.2d at 258-59; Rose v. Anderson Hay & Grain Co., 184 Wn.2d 268, 277-78, 287, 358 P.3d 1139 (2015)).

The intolerable condition that led me to submit a letter of resignation and then to be forced to leave my employment contravened a clear mandate of public policy. The four scenarios recognized as supporting a claim of wrongful discharge in violation of public policy are "'(1) where employees are fired for refusing to commit an illegal act; (2) where employees are fired for performing a public duty or obligation, such as serving jury duty; (3) where employees are fired for exercising a legal right or privilege, such as filing workers' compensation claims; and (4) where employees are fired in retaliation for reporting employer misconduct, i.e., whistle-blowing,'" (Peiffer v. Pro-Cut Concrete Cutting and Breaking Inc., 6 Wn.App.2d 803, 830, 431 P.3d 1018 (2018) citing Martin, 425 P.3d at 843 quoting Gardner v. Loomis Armored, Inc., 128 Wn.2d 931, 936, 913 P.2d 377 (1996)).

I was constructively discharged for reporting employer misconduct and for reporting the stalking incidents, and requesting a shift change and a limited amount of time off to file a police report. Their behavior violated the law and was contrary to public policy (RCW 49.60.030; 49.60.180; 49.76.115; 49.76.120). Furthermore, an employer's generalized "overriding justification" or after-acquired evidence is irrelevant to a constructive discharge claim unless it actually motivated the employer's actions, (Peiffer v. Pro-Cut Concrete Cutting and Breaking Inc., 6 Wn.App.2d 803, 830, 431 P.3d 1018 (2018)). Rasmussen Marine LLC has made claims that they did not change my shift because of concerns regarding my attendance (when they are not falsely claiming that they did adjust my shift). They have never provided evidence to support their constructive discharge of me was motivated by my attendance record.

Finally, on September 26, 2025, I hired Seattle Litigation to assist me with formulating a demand letter. My attorney, Mr. Ian Coleman, sent our demand letter on October 27, 2025 (Exhibit 22). We accused Rasmussen Marine LLC of discrimination, wrongful termination and retaliation. We did not ask for a particular amount of severance compensation.

They formally responded on November 14, 2025 and denied all of my claims (Exhibit 23). Their response was on letterhead and written on their behalf by their attorney, Mr. Brian Keeley. He wrote that I had submitted my letter of resignation on 12/5/2024 with a planned last day of 12/13/2024. He doesn't mention that Dan Ellis and Cord McCormick told me to resign after refusing to help me. Instead he claims that they tried to convince me not to resign. As previously mentioned, Cord McCormick admitted that they asked me to provide my letter of resignation (Exhibit 11).

Mr. Keeley claimed that at that meeting, on 12/5/2024, the company learned for the first time about the stalking incidents. In Erik Backstrom's statement made on 12/10/2024, he admits to two times that he corresponded with me about my safety concerns. He refers to the stalking incident that occurred on Friday, 9/27/2024. He doesn't give the exact date in his statement, but he does reference the box-truck, a unique detail. He wrote this statement before anyone in that office had a copy of my police report which is dated 12/8/2024. My police statement includes details about the incident that occurred when the man that was stalking me was driving a box-truck. When I filed my police report on 12/8/2024, I

was unable to download it until almost a week had passed. No one, including me, saw the actual report until 12/13/2024.

In Mr. Keeley's response, he claims that I "did not take Rasmussen up on their offer" of an escort. This is untrue. I had an escort for my final days. I never refused their offer. If this case goes to trial, I can easily subpoena Hayden Monasmith to give testimony about this detail.

He also states that the incidents happened "off property". He then goes on to state in reference to my claims about incidents occurring on the property, or my "workplace", that I had "reiterated" my "intent to continue to return to that workplace through December 13, 2024". He made this comment because I had given notice, after being compelled to do so by Dan Ellis. Mr. Keeley implies that I didn't consider the workplace unsafe because I had given notice and agreed to "continue to return" to that workplace.

His callous and insensitive remark only makes sense if they recognize that my "workplace" was where the incidents took place. If the incidents took place "off property", why call my honesty into question by asking why I had agreed to "continue to return" to this place that I considered to be unsafe.

He also states in the second page of his letter, in the second paragraph, that the company had "offered to adjust my schedule" and then he claims that they had adjusted my schedule. Later, in the same paragraph, he writes that they had "agreed to" adjust my shift. My shift was never adjusted. They refused to adjust my shift. This is why Hayden Monasmith was asked to escort me to my ride. He was one of only a handful of people that were still there at 4:30 PM.

Their attorney also states that I was originally scheduled to work 7:00 AM-4:00 PM and that after having difficulty arriving on time, my shift was adjusted to 7:30 AM-4:30 PM. I never worked from 7:00 AM-4:00 PM. For many years, I worked from 7:30 AM-4:00 PM. I was only required to take a half-hour long lunch. Then from April 2020-May 2021, I worked from 7:00 AM-3:30 PM. Everyone working at that facility worked that shift during this time period. The company shortened their hours of operations temporarily during the worst of the COVID-19 pandemic. This lasted until May 2021 when my shift was adjusted to 7:30 AM-4:30 PM. The adjustment had absolutely nothing to do with concerns about my attendance. At this time, I was also required (for the first time) to take an hour long lunch, instead of a half-hour lunch.

I worked for this company for twenty-four years and never received a single reprimand. My HR file is clean. If they were concerned about my attendance, there should be a record of this and there is not.

Also on the second page of his letter, Mr. Keeley states that I worked the closing shift "until just before I resigned" which is untrue. I worked this shift until I was forced to leave on 12/11/2024. My time cards attest to this (Exhibit 7). He also states that the company offered to change my shift back to 7:00 AM-4:00 PM (a shift I had never worked) and that I refused to make this change. Nothing could be further from the truth.

I find it difficult to understand how their lawyer could be so ignorant. Rasmussen Marine LLC utilized a time clock. They have a digital record of when I worked. It should not have been difficult for their attorney to get his facts straight.

In the first paragraph of the third page of this letter, their attorney writes confidently about me, “She was never required, as part of her job, to close the facility.” He repeats this sentiment again in the same paragraph by writing, “She was rarely the last person to leave the facility and never required to close it.” This is absolutely untrue. The last person to leave had to close the facility, so whether I was rarely or frequently the last person to leave the facility, I would be closing sometimes. For the record, I was frequently required to close the facility.

Furthermore, in Erik Backstrom’s statement, he boasts that he offered to wait with me “outside” the locking gate when I was closing by myself. He didn’t offer to wait with me when I was closing, but the fact that he claims to have done so demonstrates that I sometimes closed by myself. Also, his claims that he offered to wait with me *outside* the locking gate demonstrates that I did not have the option of waiting behind a locked gate.

Employees that closed the facility had separate codes for the alarm system. Every month, the company that provided their alarm service emailed Erik Backstrom a log show each and every time a code was entered, so he and others could track who was opening or closing the facility and whether anyone had entered the facility after hours. This information could easily have been provided to Mr. Keeley so he could see that I frequently closed the facility by myself. If I had refused to close by myself, I would have been fired.

On this same page, in the second paragraph, Mr. Keeley states that my harassment claims are only pertaining to the man who was stalking me. He completely ignored the discrimination and harassment I suffered because of Erik Backstrom, or the fact that I reported this harassment and discrimination to Dan Ellis and Cord McCormick on 12/5/2024. In the meeting I had with Dan Ellis and Cord McCormick on 12/5/2024, Cord McCormick actually smiled when I told them about Erik Backstrom’s racist and sexist statements. This was dehumanizing.

Finally, in the last paragraph of this letter, Mr. Keeley begins the monetary negotiations. He states that their offer is based on my length of service with the company;

> Although none of Ms. O’Callaghan’s claims have merit, and even though she voluntarily resigned while refusing the company’s reasonable offers of additional safety protections, because she was a 24-year employee of the company, Rasmussen Marine is willing to pay her $7,500 in exchange for a full release of all claims she might have against the company and those affiliated with it. If she agrees to that, we will provide you with an agreement with all terms.

I was making almost $90,000 per year when I was constructively discharged on 12/11/2024. Their offer was insulting and inappropriate. My attorney and I responded denying their counter-claims. We also made a counter-offer. These negotiations continued until March 17, 2026. The negotiations did not end because they made a fair offer. They ended because my attorney advised me that it was in my best interest to accept.

During the long process of negotiating with Rasmussen Marine LLC, I reached out to the EEOC. I started the process of filing a formal complaint on January 13, 2026, by completing the initial intake form. I had tried to file a complaint months earlier but I was unable to speak with coworkers because of

interference by Rasmussen Marine LLC. On March 5, 2026, I received a call from a representative who spoke with me about my case. My meeting was scheduled for June 23, 2026.

On March 6, 2026, I received a draft of the agreement Rasmussen Marine LLC required me to sign in order to receive any severance compensation. This agreement was titled, “Settlement Agreement and General Release”. It is a severance agreement between an employee and an employer (Exhibit 24).

I had only contracted with my attorney to help me write a demand letter. This agreement was a contingency agreement—I agreed to pay my attorney a portion of the amount I received. My attorney assured me that the provisions in the contract were “standard for employment contracts”. I did not know any better because this is the first time I had ever signed an employment contract.

My attorney told me that he “couldn’t push them any further.” The negotiation process had been agonizing and had dragged on for more than four months. I had no reason to think that my attorney would take me further, if I refused to sign. I felt compelled to sign. Rasmussen Marine LLC’s constant stalling had forced me into a corner.

I had started this process in October 2025. Prior to this, I had lost my job and nearly lost my unemployment benefits. My EEOC complaint was delayed and I was unable to file a Protected Leave complaint with Washington State’s Labor and Industries. Throughout this period, I was also unable to find another job as a Sales’ Coordinator.

The text within the agreement contains some ambiguities, enough that I believed, at the time that I signed the agreement, that my right to file a lawsuit for discrimination was protected. Months after signing this agreement, I realized, while researching my case, that the agreement I signed contains provisions that might prevent me from filing a lawsuit with my EEOC Notice to Sue.

Section (5)(a) of their contract is titled “General Release of All Claims”. It releases Rasmussen Marine LLC from any and all claims known and unknown. It is followed by a lengthy list of forty-six items. When I first read this text I almost stopped reading the agreement.

This section is immediately followed by another titled “(5) (b) Claims Not Released”. I kept reading because it was clear that signing the agreement did not release them from “any and all claims”. This section states that I cannot release them from claims for “(ii) benefits and/or the right to seek benefits under applicable workers’ compensation and /or unemployment compensation statutes,” and I would retain the right to“(iii) pursue claims which by law cannot be waived by signing this Agreement.”

That is when I looked more carefully at the first section pertaining to releases, Section (5)(a) “General Release of All Claims”. The items listed include the following;

- The Washington Paid Family and Medical Leave Law, RCW 50A
- Any provision of Title 49 of the Revised Code of Washington;
- Any provision of Title 296 of the Washington Administrative Code
- any other federal, state or local law, rule, regulation, or ordinance

- any public policy, contract, tort, or common law

A person's rights under The Washington Paid Family and Medical Leave Law, RCW 50A cannot be waived (RCW 50A.35.030(2)). Eligible employees cannot waive their right to earn at least minimum wage under RCW Title 49 and WAC Title 296 (RCW 49.46.090). Title 49 also includes RCW 49.44.085 which prohibits any provision in an employment contract that "requires an employee to waive the employee's right to publicly pursue a cause of action arising under chapter 49.60 RCW or federal antidiscrimination laws." Also included under Title 49 is RCW 49.44.211, the Silence No More law, that gives employees additional protections that cannot be waived.

The rights they refer to under their "Claims Not Released" section pertaining to Worker's compensation and unemployment benefits are protected by statutes that fall under RCW Titles 50 and 51. These two sections of the RCW must be included under "any other federal, state or local law, rule, regulation, or ordinance."

After reading this section it became clear to me that their "General Release of All Claims" does not truly release them from "any and all claims, known and unknown." Not only is the text in (5)(a) preceding the list of items ambiguous, the list of forty-six items contains rights that they recognized cannot be waived in the following section, "(5)(b) Claims Not Released." I also understood that my right to "(iii) pursue claims which by law cannot be waived by signing this Agreement" included claims that were not explicitly listed in this agreement.

The following section (c) Government Agencies states that I am not prohibited from, "(2) filing a charge or complaint with any such governmental entity (EEOC), or (3) participating, testifying, or assisting in any investigation, hearing, or other proceeding brought by, *in conjunction with*, or otherwise under the authority of any such governmental entity."

I took this to understand that I could file a complaint with the EEOC and then file a charge, in a court of law. It was not until I formally filed my complaint several weeks later in June 2026 that I learned that, when filing a complaint with the EEOC, a "charge" is simply a *formal* complaint. Their provision guarantees my right to file "a charge or complaint" which means I can file a formal complaint or a non-formal complaint. This provision lacks clarity. If I had known that I might be signing away my right to file a lawsuit for discrimination, I would not have signed.

On page 5 of their agreement, under (7) Acknowledgments and Affirmations, there are some problematic provisions. The first of these provisions, "(a) Employee affirms that Employee has not filed, caused to be filed, or presently is a party to any claim against Employer," implies that I cannot file a claim even though my rights to file claims listed under (5)(b) and (5)(c) are supposedly guaranteed in this agreement.

Even more problematic for the same reasons, in another provision in this same section, is "(c) Employee specifically covenants not to file a lawsuit against Releasees, and this covenant is a material term of this Agreement. Employee's only potential lawsuit against Releasees, after the date of this Agreement, shall be for breach of this Agreement and any such lawsuit shall be limited to the monetary consideration paid under this Agreement." This provision also requires me to sign away my right to file a claim for future wrongdoings.

Under this same section, another provision pertaining to proprietary or confidential information refers to a lawsuit I might have against Rasmussen Marine LLC. Two parts of this provision refer to a potential lawsuit, "(b) is made to Employee's attorney in relation to a lawsuit against Employer for retaliation against Employee for reporting a suspected violation of law; or (c) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.

Another provision hints at a legal claim by referring to a "legal process", "(I) Employee and Employer acknowledge Employee's rights to make truthful statements or disclosures required by law, regulation, or legal process and to request or receive confidential legal advice, and nothing in this Agreement shall be deemed to impair those rights."

Another section, (10) Governing Law and Interpretation, attempts to force me to sign a new general release of all claims if a court finds the current one unenforceable. The text states,

> "Should any provision of this Agreement be declared illegal or unenforceable by any court of competent jurisdiction and cannot be modified to be enforceable, excluding the general release language, such provision shall immediately become null and void, leaving the remainder of this Agreement in full force and effect. Should a court declare or find the general release in this Agreement to be unenforceable for any reason, Employee agrees to sign a replacement release in a form provided by Employer.

These ambiguities were absolutely unnecessary. They could have given me a contract that did not contain contradictions and unenforceable provisions. I didn't ask them for further clarity because their attorney's response on 11/14/2025 and the negotiations that followed greatly diminished the confidence my attorney and I had in Mr. Keeley. My attorney assured me that the provisions contained within the contract are "standard". The ambiguities contained within the contract led me to believe that some of the provisions did not apply to me. They couldn't all apply to me because some of the provisions contradicted other provisions. At the time that I signed the agreement, I was convinced that any contract that they provided would probably contain problematic provisions.

The EEOC provides guidance on their website, under their section titled, "Q&A-Understanding Waivers of Discrimination Claims in Employee Severance Agreements." It states that a waiver in an employment agreement is generally considered valid when an employee knowingly and voluntarily consents to the waiver. When I signed, I did not believe that I was, or even legally could, waive my right to file claims for discrimination, retaliation and constructive discharge following the filing of a complaint with the EEOC.

The ambiguities within their agreement have created legal ambiguities. Although I was represented by an attorney, I did not feel that I could extend the negotiations any further to force them to amend their agreement without losing my legal representation. I felt compelled to sign because the process had been dragged out for so long by Rasmussen Marine LLC.

Washington State usually applies contract law and if a provision in an employment agreement is ambiguous or contradicts another part of the agreement, courts often apply the rule of contra proferentem (construed against the employer) and interpret the contradiction against the party that

drafted the contract, which in this case is Rasmussen Marine LLC. Their (5)(a) General Release of All Claims and their provision under (7)(c) are contradicted by (5)(b)(iii) and (5)(c)(2).

Furthermore, the *knowingly and voluntarily* standard requires clarity. The internal contradictions contained within their agreement do not provide clarity at all. Their Severability clause which should allow the court to strike out a provision that is ambiguous contains a clause that restricts any attempt to strike out their general release of all claims and also attempts to force me to agree to an unknown replacement for their general release of all claims. Contradictions within their agreement directly involve their general release of all claims. These contradictions cannot be legally reconciled and strike at the core of their agreement. They create confusion that favors Rasmussen Marine LLC.

Their general release of all claims states that I must release them from any and all claims and yet immediately after this provision, exclusions are listed. Their general release of all claims lists forty-six items, but their allowed exclusions under their Claims Not Released are vague. There is no list of the many exclusions that cannot be waived under Washington State law and there is no explanation for why some of the items listed under their General Release of All Claims cannot be waived. Their covenant not to sue creates another paradox. Their general release of all claims should preclude a lawsuit, so this covenant must pertain to claims that cannot be waived.

The EEOC's website states that a valid agreement must offer some sort of consideration. I was offered some consideration. I am not at liberty to say how much I was given in consideration. I can disclose that only $10,000 was for wages. The remainder was for emotional distress pay. I am not suing for additional emotional distress pay.

Two more requirements for a valid agreement are that it not require an employee to waive future rights and that it complies with applicable state and federal laws. I am required to waive my future rights under section (7)(c). Their requirement for me to waive my right to any and all claims including those that fall under Title VII, RCW 49.60, and any provision of Title 49 of the Revised Code of Washington violate RCW 49.44.085. Other items listed under their general release of all claims are also in violation of the Revised Code of Washington and have already been addressed.

RCW 49.44.085 has been tested in the federal courts. Cases such as Kester Phillips v. Swedish Health Services (2025) and Douglas Altshuler v. Space Exploration Technology Corporation (2025) highlight the conflict that can occur between state and federal laws, specifically when there is a conflict with the Federal Arbitration Act (FAA). Federal preemption only applies when a contract *actually contains* a mandatory arbitration clause that a state law, such as 49.44.085 RCW, tries to ban. My case does not have a conflict of this kind because there is no arbitration clause.

When I discussed the discrimination I suffered after my meeting on 12/5/2024 with coworkers, Rasmussen Marine LLC retaliated by discharging me on 12/11/2024. They retaliated further by attempting to prevent me from collecting unemployment or Labor and Industries benefits, as well as discuss the discrimination with my coworkers in February 2025. RCW 49.44.211(3) states that it is "a violation …….for an employer to discharge or otherwise discriminate or retaliate against an employee for disclosing or discussing conduct that the employee reasonably believed to be illegal harassment, illegal discrimination, illegal retaliation,…"

The EEOC's *Enforcement Guidance on Retaliation and Related Issues* states the following; "Courts have not limited the scope of the opposition clause to complaints made to the employer; complaints about the employer to others that the employer learns about can be protected opposition." It also states that "Talking to coworkers to gather information or evidence in support of a potential EEO claim is protected opposition, provided the manner of opposition is reasonable."

Retaliation is an adverse action that is any conduct that might well dissuade a reasonable person from making or supporting a discrimination complaint. I was discharged exactly a week after I reported discrimination and stalking incidents to the company president, Dan Ellis and the controller, Cord McCormick. When I notified them, they did nothing to correct Erik Backstrom's behavior and they refused to adjust my shift to accommodate me when notified of the stalking incidents. They knew about the stalking incidents and failed to take appropriate corrective action.

Their unwillingness to help me made my workplace so intolerable that I was forced to submit my letter of resignation. They made the working conditions so intolerable that any reasonable person in my position would have felt compelled to resign (Pennsylvania State Police v. Suders). One week later, they tried to force me to sign a statement that contained false claims and then ordered me to leave when I asked to discuss the details of the letter further with the author of the letter, Dan Ellis. The one-week timeline between my first formal meeting on 12/5/2024 and the date that I was discharged on 12/11/2024 demonstrates temporal proximity that is evidence of causation.

The Tenth Circuit in Williams v. W.D. Sports, Inc. held that an employer's attempt to deny or interfere with unemployment benefits is actionable retaliation under Title VII —even without showing the benefits were actually denied. The standard is whether a reasonable employee would be "dissuaded from making or supporting a charge of discrimination." RCW 51.48.025 prohibits an employer from discharging or discriminating against an employee "because such employee has filed or communicated to the employer an intent to file a claim for compensation or exercises any rights provided under this title."

RCW 49.44.211, popularly referred to as the Silence No More act, prohibits nondisclosure and nondisparagement provisions pertaining to any illegal harassment or discrimination in employment agreements (RCW 49.44.211(1). By trying to prevent me from filing any claim including any future claim, they are effectively trying to silence me. This law specifically prohibits them from requesting or requiring that I enter into any agreement provision that is prohibited by this law.

In Roberson v. SEIU Healthcare 1199NW, No. 26-cv-05143-KKE (W.D. Wash.)), the court ruled that an explicit carve-out provision for reporting workplace discrimination to the EEOC or another federal, state, or local agency with jurisdiction over workplace or employment issues was insufficient with regards to RCW 49.44.211. The claimant argued that the carve-out provision only permitted her to disclose Defendants' discriminatory conduct to an agency, but did not explicitly permit her to disclose Defendants' discriminatory conduct in the context of a lawsuit. The carve-out provision in her contract contained the following text;

> Nothing in this Agreement shall be construed to prohibit Employee from pursuing or participating in any investigation or proceeding conducted by the EEOC or another federal, state or local agency with jurisdiction over workplace or employment issues. Further, nothing in

> this Agreement prohibits, prevents, or interferes with Employee's right to communicate, and/or initiate communications, with the EEOC and other federal, state or local agencies with jurisdiction over workplace or employment issues.

Section (5)(c) of the agreement, Government Agencies, has the following text which is very similar to the carve-out provision contained within Roberson's agreement;

> Nothing in this Agreement or any other agreement Employee may have signed or company policy, prohibits, prevents, or otherwise limits Employee from (1) reporting possible violations of federal or other law or regulations to any governmental agency, legislative, regulatory or judicial body, or law enforcement authority (e.g., EEOC, NLRB, SEC, DOJ, CFTC, any federal agency responsible for workplace safety, U.S. Congress, or an Inspector General), (2) filing a charge or complaint with any such governmental entity, or (3) participating, testifying, or assisting in any investigation, hearing, or other proceeding brought by, in conjunction with, or otherwise under the authority of any such governmental entity…..

The Court ruled that when the settlement agreement was read in the light most favorable to Roberson, the carve-out was not broad enough to avoid the application of RCW 49.44.211(1) because its non-disclosure provision could be read to prohibit Roberson from disclosing the facts of her case in a lawsuit. The provision in my agreement can be read in the same light.

Another boiler-plate provision in their agreement directly addresses RCW 49.44.211;

> (7)(k) Nothing in this Agreement is intended to or shall prevent Employee from disclosing information that Employee has a right to disclose under applicable law, including but not limited to, Employee discussing or disclosing information relating to conduct that Employee reasonably believes to be illegal discrimination, illegal harassment, illegal retaliation, a wage and hour violation, sexual assault, that is recognized as illegal under Washington state, federal, or common law, or that is recognized as against a clear mandate of public policy and that occurs at the workplace, at work-related events coordinated by or through the employer, between employees, or between an employer and an employee, whether on or off the employment premises.

Although this provision specifically refers to my right to disclose and discuss "information that Employee has a right to disclose under applicable law," it does not state that I have the right to disclose or discuss the existence of a settlement agreement, an important and crucial right protected by RCW 49.44.211(1). Another of their provisions seems to contradict this one altogether and calls into question whether I can freely disclose information that is my right to disclose under applicable law, especially if it pertains to an Employee agreement;

> (7)(e) Employee also affirms that Employee has not divulged any proprietary or *confidential information of Employer* and *will continue to maintain the confidentiality* of such information consistent with Employer's policies and *Employee's agreement(s)* with Employer and/or common law.

As with the aforementioned provision, (5)(c), this provision could also easily be read as a prohibition of any disclosure of *confidential* facts pertaining to my case in a lawsuit, or in any circumstance. These two provisions, (5)(c) and (7)(e) taken together create a nondisclosure and nondisparagement agreement between me and Rasmussen Marine LLC requiring me to remain silent about my employment agreement. A provision that prevents me from disclosing the contents of their employment agreement with me also prevents me from discussing or disclosing illegal discrimination, illegal harassment, and illegal retaliation or filing a claim.

The Notes pertaining to RCW 49.44.211 state;

> The legislature recognizes that there exists a strong public policy in favor of the disclosure of illegal discrimination, illegal harassment, illegal retaliation, wage and hour violations, and sexual assault, that is recognized as illegal under Washington state, federal, or common law, or that is recognized as against a clear mandate of public policy…." (Intent—2022 c133).

Any provision in an employment contract that is contrary to this section of the Revised Code of Washington is "void and unenforceable" (RCW 49.44.211(1)). Any attempt by an employer to "request or require that an employee enter into any agreement provision that is prohibited" is in violation of the law (RCW 49.44.211(4). All aspects of this entire section of the Revised Code of Washington should be enforceable regardless of any provision(s) in an employment contract.

RCW 49.44.211(3) states that it is a violation of this section for an employer to discharge or otherwise discriminate or retaliate against an employee for disclosing or discussing conduct that the employee reasonably believed to be illegal harassment, illegal discrimination, and illegal retaliation. I disclosed and discussed illegal harassment and discrimination with Dan Ellis and Cord McCormick on 12/5/2024. I then discussed illegal harassment and discrimination with my coworkers. The company's response to this was to discharge me and then retaliate further after my constructive discharge.

This section also states that I have the "right to pursue a civil cause of action for actual or statutory damages of $10,000, whichever is more, as well as reasonable attorneys' fees and costs" (49.44.211(7). I am asking for actual damages and legal fees. I am not asking for statutory damages.

If my right to pursue a civil cause of action under 49.44.211(7) can be waived, then any part of this entire section, RCW 49.44.211, can be waived with a provision in an employment contract, including 49.44.211(1). It should also be noted that "for the purposes of this section, 'employee' means a current, former, or prospective employee or independent contractor," (RCW 49.44.211(8)) and "the provisions of this section are to be liberally construed to fulfill its remedial purpose," (RCW 49.44.211(10)). This interpretation of RCW 49.44.211 does not conflict with any federal laws.

The provisions in the contract that attempt to limit my rights and force me to waive rights that I cannot waive under the law are a form of misrepresentation. This should be considered improper conduct on the part of Rasmussen Marine LLC that led to their undue influence over the negotiations because the final agreement unfairly benefited them. Although the negotiations dragged on for more than four months, I did not receive their contract until the last few weeks of the negotiation process.

By the time I received it, I could not easily request amendments to their provisions without risking the entire negotiation process falling apart. Their agreement was drafted by them and my attorney and I had almost no input. The one exception was the payment terms. We were able to request that they paid us in two parts instead of three.

They have falsely claimed several times that they tried to improve safety for me. They have not addressed the fact that I could have worked from home. I had both a company provided laptop and smartphone. During my meeting on 12/5/2024, I did not even think to ask for this because I was so shocked by their reactions.

Sales' persons and anyone working in the Accounting Department had the option of working from home if there was an emergency, such as a child home sick for the day or if their household had been exposed to Covid 19. I had previously worked from home for three days per week for a few months during the height of the Covid 19 epidemic in 2020 without any trouble. My office workstation consisted of my company laptop and a monitor. I did not have any files or anything else at the office that I needed to perform my tasks. I could have easily been transitioned into remote employment. If I had been given this option, I might still be employed with Rasmussen Marine LLC today.

I am fifty-one years of age. As previously stated, I worked for Rasmussen Marine LLC for twenty-four years, a period of time that largely constitutes my entire professional career. I believed that I would retire with them. This experience has been devastating, traumatic and life-changing. I have not yet found another job to replace the one that I lost. I have even started looking for jobs that fall under my former line of work, administration.

My former salary was $41.00 per hour and I worked 40 hours per week. I also received a monthly bonus which varied from $400.00 to $1200.00 (Exhibit 25). At the time that I was forced to leave my former job, I was about to receive a raise of $1.00 per hour. Raises were normally received in December and went into effect in January. If I had not been forced to leave, my hourly pay rate would have increased in January 2025 to $42.00 per hour and almost certainly again to $43.00 per hour in January 2026.

I am hopeful and confident that I will find a job as an Administrative Assistant. The current average annual salary of an Administrative Assistant in the Seattle-Tacoma region is $50,820.00, which is $43,420.00 less than I would likely be making if I hadn't lost my job at Rasmussen Marine LLC (Exhibit 26). I am fifteen years away from retirement. It will take me years to get back to where I was, professionally and financially, before I suffered this tremendous setback, if I am ever able to do so. I humbly ask that I be allowed to present my case. I thank the court for their attention to this statement.

Signature: [signature] Date: 9-17-2026

Michelle O'Callaghan

# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

**Seattle Field Office**
909 First Avenue, Suite 400
Seattle, WA 98104
(206) 576-3000
Website: www.eeoc.gov

## DETERMINATION AND NOTICE OF RIGHTS

(This Notice replaces EEOC FORMS 161, 161-A & 161-B)

Issued On: 06/25/2026

**To:** Miss Michellle M. OCallaghan
7945 9th Ave SW, Unit B
SEATTLE, WA 98106
Charge No: 551-2026-02172

EEOC Representative and email: MICHELLE WILLIAMS
INVESTIGATOR SUPPORT ASSISTANT
MICHELLE.WILLIAMS@EEOC.GOV

---

### DETERMINATION AND NOTICE OF RIGHTS

The EEOC issues the following determination: The EEOC will not proceed further with its investigation and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice that the EEOC has dismissed your charge and has issued you notice of your right to sue the respondent(s) on this charge. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of EEOC's official notice of dismissal.** You should keep a record of the date you received the EEOC's official notice of dismissal. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign-in to the EEOC Public Portal and upload the court complaint to charge 551-2026-02172.

On Behalf of the Commission

June 24, 2026 — [signature] for

Date — Elizabeth M. Cannon
Director

**Cc:** Rasmussen Marine

Please retain this Notice for your records.

# INFORMATION RELATED TO FILING SUIT
# UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court* ***under Federal law****. If you also plan to sue claiming violations of State law, please be aware that time limits may be shorter and other provisions of State law may be different than those described below.)*

## IMPORTANT TIME LIMITS – 90 DAYS TO FILE A LAWSUIT

If you choose to file a lawsuit against the respondent(s) named in the charge of discrimination, you must file a complaint in court **within 90 days of the date you *receive* EEOC's official notice of dismissal**. You should **keep a record of the date you received EEOC's official notice of dismissal**. Once this 90-day period has passed, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and the record of your receiving EEOC's official notice of dismissal (email or envelope).

If your lawsuit includes a claim under the Equal Pay Act (EPA), you must file your complaint in court within 2 years (3 years for willful violations) of the date you did not receive equal pay. This time limit for filing an EPA lawsuit is separate from the 90-day filing period under Title VII, the ADA, GINA, the ADEA, or the PWFA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA, the ADEA, or the PWFA, in addition to suing on the EPA claim, your lawsuit must be filed within 90 days of your receipt of EEOC's official notice of dismissal and within the 2- or 3-year EPA period.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Filing this Notice is not enough. For more information about filing a lawsuit, go to https://www.eeoc.gov/employees/lawsuit.cfm.

## ATTORNEY REPRESENTATION

For information about locating an attorney to represent you, go to:
https://www.eeoc.gov/employees/lawsuit.cfm.

In very limited circumstances, a U.S. District Court may appoint an attorney to represent individuals who demonstrate that they are financially unable to afford an attorney.

## HOW TO REQUEST YOUR CHARGE FILE AND 90-DAY TIME LIMIT FOR REQUESTS

There are two ways to request a charge file: 1) a Freedom of Information Act (FOIA) request or 2) a "Section 83" request. You may request your charge file under either or both procedures. EEOC can generally respond to Section 83 requests more promptly than FOIA requests.

Since a lawsuit must be filed within 90 days of EEOC's official notice of dismissal, please submit your FOIA and/or Section 83 request for the charge file promptly to allow sufficient time for EEOC to respond and for your review.

**To make a FOIA request for your charge file**, submit your request online at https://eeoc.arkcase.com/foia/portal/login (this is the preferred method). You may also submit a

FOIA request for your charge file by U.S. Mail by submitting a signed, written request identifying your request as a "FOIA Request" for Charge Number 551-2026-02172 to the District Director at Christopher Green, 450 Golden Gate Avenue 5 West PO Box 36025, San Francisco, CA 94102.

**To make a Section 83 request for your charge file**, submit a signed written request stating it is a "Section 83 Request" for Charge Number 551-2026-02172 to the District Director at Christopher Green, 450 Golden Gate Avenue 5 West PO Box 36025, San Francisco, CA 94102.

You may request the charge file up to 90 days after receiving EEOC's official notice of dismissal. After the 90 days have passed, you may request the charge file only if you have filed a lawsuit in court and provide a copy of the court complaint to EEOC.

For more information on submitting FOIA requests, go to https://www.eeoc.gov/eeoc/foia/index.cfm.

For more information on submitted Section 83 requests, go to https://www.eeoc.gov/foia/section-83-disclosure-information-charge-files.

# CHARGE OF DISCRIMINATION

Form 5 (06/24)

This form is affected by the Privacy Act of 1974.
See attached Privacy Act Statement and other information before completing this form.

| **CHARGE PRESENTED TO:** | **AGENCY CHARGE NO.** |
|---|---|
| EEOC | 551-2026-02172 |
| Washington State Human Rights Commission | |

Name *(indicate Mr., Ms., Mrs., Miss, Dr., Hon., Rev.)*: Miss Michellle M. OCallaghan

Phone No.: 206-581-5840

Year of Birth: 1974

Mailing Address: 7945 9th Ave SW, Unit B

SEATTLE, WA 98106

Named below is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency that I believe discriminated against me or others.

Name: RASMUSSEN MARINE, LLC

No. Employees, Members: 15 - 100 Employees

Phone No.: (206) 762-3700

Mailing Address: 415 S CLOVERDALE ST

SEATTLE, WA 98108, UNITED STATES OF AMERICA

Name:

No. Employees, Members:

Phone No.:

Mailing Address:

DISCRIMINATION BASED ON:

National Origin, Retaliation, Sex

DATE(S) DISCRIMINATION TOOK PLACE

Earliest: 12/01/2024

Latest: 09/17/2025

THE PARTICULARS ARE:

I began working for Rasmussen Marine LLC, hereafter Respondent, on or around October 7, 2000, and my most recent position title was Sales Coordinator. During my employment I performed the duties of my position in a satisfactory manner.

I repeatedly reported harassment to Respondent in/around December 2024. Respondent failed to take prompt or corrective action regarding the harassment and began subjecting me to adverse terms and conditions of employment in retaliation for my complaints. Employees outside of my protected groups and/or who had not complained of harassment were treated with preference. Due to the hostile work environment, I felt I had no other option but to resign from my position. However, Respondent continued to retaliate against me through September 17, 2025.

I believe I have been discriminated against due to my sex (Female), national origin/ethnicity (Hispanic), and in retaliation for engaging in a protected activity, in violation of Title VII of the Civil Rights Act of 1964, as amended.

I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

I declare under penalty of perjury that the above is true and correct, and that I have read each page of this form.

Digitally Signed By: Miss Michellle M. OCallaghan

06/23/2026

Charging Party Signature & Date

If a state or local Fair Employment Practices Agency (FEPA) requires notarization, you may need to sign the charge in the presence of a notary. If so, please do so here.

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information, and belief.

________________________________________

Notarized Signature of Charging Party

Subscribed and sworn to before me this date:

Signature of Notary________________________________________________

Printed Name __________________________________________________

## CP ENCLOSURE WITH EEOC FORM 5 (06/24)

### PRIVACY ACT STATEMENT

Under the Privacy Act of 1974, Pub. Law 93-579, authority to request personal data and its uses are:

1. **FORM NUMBER/TITLE/DATE.** EEOC Form 5, Charge of Discrimination (06/24).
2. **AUTHORITY.** 42 U.S.C. 2000e-5(b), 29 U.S.C. 211, 29 U.S.C. 626, 42 U.S.C. 12117, 42 U.S.C. 2000ff-6.
3. **PRINCIPAL PURPOSES.** The purposes of a charge, taken on this form or otherwise reduced to writing (whether later recorded on this form or not) are, as applicable under the EEOC anti-discrimination statutes (EEOC statutes), to preserve private suit rights under the EEOC statutes, to invoke the EEOC's jurisdiction and, where dual-filing or referral arrangements exist, to begin state or local proceedings.
4. **ROUTINE USES.** This form is used to provide facts that may establish the existence of matters covered by the EEOC statutes (and as applicable, other federal, state or local laws). Information given will be used by staff to guide its mediation and investigation efforts and, as applicable, to determine, conciliate and litigate claims of unlawful discrimination. This form may be presented to or disclosed to other federal, state or local agencies as appropriate or necessary in carrying out EEOC's functions. A copy of this charge will ordinarily be sent to the respondent organization against which the charge is made.
5. **WHETHER DISCLOSURE IS MANDATORY; EFFECT OF NOT GIVING INFORMATION.** Charges must be reduced to writing and should identify the charging and responding parties and the actions or policies complained of. Without a written charge, EEOC will ordinarily not act on the complaint. Charges under Title VII, the ADA or GINA must be sworn to or affirmed (either by using this form or by presenting a notarized statement or unsworn declaration under penalty of perjury); charges under the ADEA should ordinarily be signed. Charges may be clarified or amplified later by amendment. It is not mandatory that this form be used to make a charge.

### NOTICE OF RIGHT TO REQUEST SUBSTANTIAL WEIGHT REVIEW

Charges filed at a state or local Fair Employment Practices Agency (FEPA) that dual-files charges with EEOC will ordinarily be handled first by the FEPA. Some charges filed at EEOC may also be first handled by a FEPA under worksharing agreements. You will be told which agency will handle your charge. When the FEPA is the first to handle the charge, it will notify you of its final resolution of the matter. Then, if you wish EEOC to give Substantial Weight Review to the FEPA's final findings, you must ask us in writing to do so *within 15 days* of your receipt of its findings. Otherwise, we will ordinarily adopt the FEPA's finding and close our file on the charge.

### NOTICE OF NON-RETALIATION REQUIREMENTS

Please **notify** EEOC or the state or local agency where you filed your charge **if retaliation is taken against you or others** who oppose discrimination or cooperate in any investigation or lawsuit concerning this charge. Under Section 704(a) of Title VII, Section 4(d) of the ADEA, Section 503(a) of the ADA, Section 207(f) of GINA, and 42 USC 2000gg-2(f)(1) of the PWFA it is unlawful for an *employer* to discriminate against present or former employees or job applicants, for an *employment agency* to discriminate against anyone, or for a *union* to discriminate against its members or membership applicants, because they have opposed any practice made unlawful by the statutes, or because they have made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the laws. The Equal Pay Act has similar provisions and Section 503(b) of the ADA prohibits coercion, intimidation, threats or interference with anyone for exercising or enjoying, or aiding or encouraging others in their exercise or enjoyment of, rights under the Act.